No. 21-1421

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

WILLIAM MCGLASHAN, JR.,

*Appellant.*

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 1:19-cr-10080-NMG-15
Honorable Nathaniel M. Gorton

### APPELLANT'S REPLY BRIEF

Jack W. Pirozzolo (#61887)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Tel.: (617) 223-0304
jpirozzolo@sidley.com

John C. Hueston (#1199021)
HUESTON HENNIGAN LLP
523 W. 6th Street
Los Angeles, CA 90014
Tel.: (213) 788-4340
jhueston@hueston.com

Carter G. Phillips (#48909)
Daniel J. Feith (#1199069)
John L. Gibbons (#1199068)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
cphillips@sidley.com
dfeith@sidley.com
jgibbons@sidley.com

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION ................................................................................... 1

ARGUMENT ........................................................................................... 2

   I.   NEITHER ACT SCORES NOR SCORE REPORTS ARE
       "PROPERTY." ................................................................................ 2

       A.   The Government's Attempt to Make This Case About
            Score Reports Rather Than Scores Betrays the
            Weakness of Its Property Fraud Theory. ........................... 5

       B.   Neither Scores Nor Score Reports Are an Interest
            Long Recognized as Property. .............................................. 7

       C.   The Government Misunderstands *Hedaithy* .................... 13

  II.   ACT TESTS WERE AN IMPLEMENTATION COST, NOT
       AN OBJECT, OF THE ALLEGED SCHEME. ......................... 16

  III.   THE INDICTMENT DOES NOT ALLEGE THE
       FIDUCIARY ELEMENT OF HONEST-SERVICES
       FRAUD. ....................................................................................... 22

       A.   Under *Skilling*, §1346 Does Not Reach Informal
            Fiduciaries. ........................................................................... 22

       B.   Appellant Preserved His Honest-Services Arguments
            for Appeal. ............................................................................ 28

CONCLUSION ..................................................................................... 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bouie v. City of Columbia,*
378 U.S. 347 (1964) ................................................................... 27

*Carpenter v. United States,*
484 U.S. 19 (1987) ........................................................... 7, 10, 15

*Chiarella v. United States,*
445 U.S. 222 (1980) ................................................................. 26

*Cleveland v. United States,*
531 U.S. 12 (2000) ............................................................. *passim*

*Kelly v. United States,*
140 S.Ct. 1565 (2020) ....................................................... *passim*

*Marinello v. United States,*
138 S.Ct. 1101 (2018) ............................................................. 11

*McNally v. United States,*
483 U.S. 350 (1987) ........................................................... 4, 12

*Pasquantino v. United States,*
544 U.S. 349 (2005) ......................................................... 7, 8, 9

*Sekhar v. United States,*
570 U.S. 729 (2013) ........................................................... 6, 12

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996) ................................................................... 8

*Skilling v. United States,*
561 U.S. 358 (2010) ........................................................... *passim*

*Sorich v. United States,*
555 U.S. 1204 (2009) ............................................................. 26

*UBS Fin. Servs., Inc. v. Aliberti,*
  483 Mass. 396, 133 N.E.3d 277 (2019) ................................................ 25

*Uneeda Doll Co. v. P & M Doll Co.,*
  353 F.2d 788 (2d Cir. 1965) ................................................................. 15

*United States v. Acosta-Roman,*
  549 F.3d 1 (1st Cir. 2008) ..................................................................... 28

*United States v. Adams,*
  971 F.3d 22 (1st Cir. 2020) ............................................................. 32, 33

*United States v. Berroa,*
  856 F.3d 141 (1st Cir. 2017) ............................................................... 2, 9

*United States v. Colón-Rosario,*
  921 F.3d 306 (1st Cir. 2019) .......................................................... 32, 33

*United States v. Fernández-Cabrera,*
  625 F.3d 48 (1st Cir. 2010) ................................................................... 28

*United States v. Fuentes-Moreno,*
  954 F.3d 383 (1st Cir. 2020) ............................................................... 32

*United States v. Gatto,*
  986 F.3d 105 (2d Cir.), *cert. denied*, 142 S.Ct. 710 (2021) ............ 20, 21

*United States v. Hedaithy,*
  392 F.3d 580 (3d Cir. 2004) ..................................................... 13, 14, 15

*United States v. Milovanovic,*
  678 F.3d 713 (9th Cir. 2012) ................................................... 24, 30, 31

*United States v. Ochs,*
  842 F.2d 515 (1st Cir. 1988) ........................................................... 4, 12

*United States v. Sadler,*
  750 F.3d 585 (6th Cir. 2014) ............................................................... 13

*United States v. Shelton,*
  997 F.3d 749 (7th Cir. 2021) ......................................................... 19, 20

*United States v. Valle,*
 807 F.3d 508 (2d Cir. 2015) ................................................................ 3

*United States v. Yates,*
 16 F.4th 256 (9th Cir. 2021) .................................................. 12, 13, 21

*Van Buren v. United States,*
 141 S.Ct. 1648 (2021) ........................................................................ 10

*Waters v. Churchill,*
 511 U.S. 661 (1994) .............................................................................. 8

## Statutes and Regulation

17 U.S.C. §102(a) ................................................................................. 15

18 U.S.C. §1346 .............................................. 22, 23, 24, 25, 26, 27, 30, 31

17 C.F.R. §240.10b5-2(b) ..................................................................... 26

## Other Authorities

Restatement (Second) of Contracts (1981) ........................................... 28

Antonin Scalia & Bryan A. Garner, *Reading Law: The
 Interpretation of Legal Texts* (2012) ...................................................... 7

# INTRODUCTION

In recent decades, the Supreme Court has repeatedly rejected efforts by the government to construe the mail, wire, and honest-services fraud statutes in ways that would "approve a sweeping expansion of federal criminal jurisdiction," undermine due process, and erode federalism. *Cleveland v. United States*, 531 U.S. 12, 24 (2000); *see* Br.6-11. Undeterred, the government ignores the Court's admonitions and tries again here. It does not dispute that its theories of property fraud would criminalize much academic dishonesty and many other forms of commonplace conduct by otherwise law-abiding individuals. Nor does it dispute that its theory of honest-services fraud would bring innumerable everyday commercial arrangements into that statute's reach. It simply argues that the federal fraud statutes in fact have such sweep.

The government is wrong. As discussed in detail below, its arguments depend on erasing reasonable limits on the fraud statutes' reach that prevent them from criminalizing all "deception, corruption, [and] abuse of power." *Kelly v. United States*, 140 S.Ct. 1565, 1568 (2020). The government has tried before to circumvent such limits, and both the Supreme Court and this Court have blocked its path. *See, e.g.*, *id.* at 1574;

1

*United States v. Berroa*, 856 F.3d 141, 149 (1st Cir. 2017). The Court should do the same here.

## ARGUMENT

### I.    NEITHER ACT SCORES NOR SCORE REPORTS ARE "PROPERTY."

Appellant's brief demonstrated the alarming implications of the government's view that test scores are property. Br.36-41. Yet the government offers essentially no response. It offers no limiting principle that would prevent cheating on any test by any student in any setting from being a federal crime whenever Zoom, the Internet, or a smartphone happens to be involved; no limiting principle that would safeguard federalism by protecting education, a traditional sphere of state regulation, from oversight by federal prosecutors; no limiting principle that would avoid the risk of arbitrary enforcement from turning countless Americans into criminals; and no limiting principle that would provide fair notice for when intangible interests are property.

Instead, as usual when it overreaches, the government suggests that the "context" here is different and that the Court simply should not concern itself with the obvious implications of the government's position. Opp.22. But the only distinction the government offers is with "purely

academic setting[s]," *id.*, and that distinction lacks any basis. Like ACT, academic institutions value the integrity of the grades and scores they issue, and many charge fees for their services. The government is also mistaken in describing ACT as a "private for-profit business." Opp.14 (cleaned up). As the Indictment alleges, ACT, like many purely academic institutions, is a non-profit. JA3¶21.

Moreover, the government's blinkered approach is not how the rule of law works. "Whatever the apparent merits of imposing criminal liability may seem to be *in this case*," the Court "must construe the statute knowing that [its] interpretation … will govern many other situations." *United States v. Valle*, 807 F.3d 508, 528 (2d Cir. 2015). The government's unwillingness here to acknowledge, much less defend the implications of its interpretation for "other situations" speaks volumes.

Indeed, what the government *does* say in its brief reveals its determination to stretch the already-broad concept of "property" to give the wire and mail fraud statutes limitless reach. First, the government argues that the statutes are not limited to interests that have long been recognized as property, and encompass any "species of valuable right and interest." Opp.19. Alternatively, the government argues that something

is property so long as it is *associated* with interests "traditionally used to define property, such as economic value and the rights of allocation, exclusion, and control," even if the thing itself has never been understood or recognized as property. Opp.18.

As explained below, these arguments are contrary to core principles cabining the mail and wire fraud statutes' reach. They would dramatically expand the scope of these statutes and allow the government to recharacterize as property fraud forms of unethical conduct the Supreme Court has already excluded from the fraud statutes' reach, "let[ting] in through the back door the very prosecution theor[ies] that the Supreme Court tossed out the front." *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988). Time and again, when asked to "approve a sweeping expansion of federal criminal jurisdiction" of the sort the government urges here, the Supreme Court has required a "clear statement by Congress." *Cleveland*, 531 U.S. at 24; *see Skilling v. United States*, 561 U.S. 358, 411 (2010); *McNally v. United States*, 483 U.S. 350, 359-60 (1987). The government's inability to identify anything of the sort here confirms that test scores are not property.

**A.    The Government's Attempt to Make This Case About Score Reports Rather Than Scores Betrays the Weakness of Its Property Fraud Theory.**

To begin with, the government evidently recognizes the problems with treating test scores as property because its brief tries to change what property is actually at issue here. In the Indictment, the government alleged that Appellant "fraudulently obtained test scores," JA10¶65; *see* JA65¶376 (alleging a scheme "for obtaining … test scores"), and thereby deprived ACT, Inc. of its "intellectual and physical property," JA7¶54. Accordingly, in the plea agreement, the government agreed Appellant could appeal whether "test scores can[], as a matter of law, constitute property for purposes of the mail or wire fraud statutes." JA112. Now, however, the government entirely abandons the argument that scores are property and contends only that "the reports in which those scores are conveyed are property." Opp.9.

This shift elides the fact that neither the Indictment nor plea agreement ever mentions scores reports. And for good reason: the notion that Appellant fraudulently obtained a score *report—i.e.*, that the report itself was the object of Appellant's fraud—is preposterous. Appellant's son would have received a score report after taking the test *regardless*. What

Appellant obtained *through misrepresentation* was a higher score—a point the Indictment acknowledges over and over. *See* JA10¶65 ("fraudulently obtained test scores"); JA11¶66(h) (similar); JA65¶376 (similar).

"The Government's shifting and imprecise characterization of the alleged property at issue betrays the weakness of its case." *Sekhar v. United States*, 570 U.S. 729, 737 (2013). The Indictment alleges a scheme to fraudulently obtain test scores; the government abandons that theory. The Indictment alleges test scores are physical and intellectual property; the government abandons that theory as well. The government evidently views the "property" element as a game of whack-a-mole: When one theory gets squashed, another closely adjacent one pops up in its place. As explained below, the government can play this game because its understanding of property has virtually no limits. Its brief inadvertently illustrates the point: though it seems to acknowledge scores are *not* property, every argument it makes that score reports are property would apply equally to scores. *Infra* §I.B. Fortunately, the Supreme Court has recognized limits on property other than the government's inventiveness, and under those limits, schemes to obtain either scores or score reports are beyond the fraud statutes' reach.

**B.    Neither Scores Nor Score Reports Are an Interest Long Recognized as Property.**

Appellant's brief showed that test scores are not an "interest that 'has long been recognized as property,'" *Cleveland*, 531 U.S. at 23 (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)); *see* Br.29, and the government does not argue otherwise. Scores and grades have existed for centuries, yet the government does not identify any historical source recognizing them (or reports recording them) as property. Nor does the government even show that, when the fraud statutes were enacted, anyone understood the term "property" to embrace scores and score reports. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 16 (2012) ("[W]ords mean what they conveyed to reasonable people at the time they were written …."). Because the government's theory "stray[s] from traditional concepts of property," *Cleveland*, 531 U.S. at 24, this Court should reject it.

The government advances two arguments to avoid this conclusion. First, it contends that "property" is not limited to traditionally recognized property interests because, in *Pasquantino v. United States*, 544 U.S. 349 (2005), the Supreme Court supposedly held that it extends "to every species of valuable right and interest." Opp.19 (quoting *Pasquantino*, 544

U.S. at 356). This argument, however, misunderstands what *Pasquantino* addressed. The question there was whether the government's interest in tax revenue was regulatory or proprietary. *See* Petrs. Br. 41-44, *Pasquantino*, 544 U.S. 349 (No. 03-725). The government argued for the latter view by expressly embracing historical limits on §1343. *See* U.S. Br. 29-30, *Pasquantino*, 544 U.S. 349 (No. 03-725) (arguing that "*in accordance with its common law antecedents*, [§1343] covers any scheme to deprive a victim of money or property that is legally due to the victim" (emphasis added)). Thus, *Pasquantino* did not present the question of whether "property" reached beyond traditionally recognized interests, and so "cannot be read as foreclosing an argument that [it] never dealt with."[1] *Waters v. Churchill*, 511 U.S. 661, 678 (1994) (plurality opinion).

---

[1] Moreover, as Appellant explained, *Pasquantino*'s expansive definition would be dicta even if *Pasquantino* actually addressed this question. Br.27-28. The government characterizes the definition as a holding because *Pasquantino* "first employed this definition to conclude that an entitlement to collect money was property and then confirmed that conclusion by noting the historical pedigree of that interest." Opp.19 (cleaned up). The scope of a holding, however, turns not on the order in which issues are discussed, but on whether an issue is logically necessary to the opinion's result. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996). Because the interest in *Pasquantino* had "long been thought to be a species of property," 544 U.S. at 356, a broader definition was wholly unnecessary to *Pasquantino*'s result and therefore was dicta. *Cleveland*,

As this Court has recognized, *Cleveland* rejected theories that "strayed from traditional concepts of property," *Berroa*, 856 F.3d at 149 (cleaned up), and there is no basis for reading *Pasquantino* as silently overruling that limit.

Second, the government argues that even if some historical limit exists, property is anything "*associated with* interests traditionally used to define property," Opp.18 (emphasis added), even if the thing itself has not been traditionally recognized as property. Thus, the government continues, score reports are property because they "bear the primary traditional hallmarks of property: economic value and the right to exclude." Opp.21 (citations omitted). But the government's attempt to define property as anything associated with certain intangible rights is wrong in several ways.

Fundamentally, the argument contradicts Supreme Court precedent. Far from holding, as the government argues, that property includes anything "associated with interests traditionally used to define property," Opp.18, *Cleveland* rejected that approach as the source of the lower

---

by contrast, framed its "traditional concepts of property" limitation as a holding. 531 U.S. at 24.

court's error, 531 U.S. at 23-24. *Cleveland* acknowledged that gambling licenses were associated with "intangible rights of allocation, exclusion, and control," but nevertheless held that they are "far from composing an interest that 'has long been recognized as property.'" *Id.* at 23. *Kelly*, likewise, held that bridge lanes were not "property" even though they were subject to "rights of 'allocation, exclusion, and control.'" 140 S.Ct. at 1573. These cases make clear that mere association with "interests traditionally used to define property," Opp.18, does *not* make an interest property. Rather, as *Carpenter* shows, the underlying interest *itself* must have "long been recognized as property." *Carpenter*, 484 U.S. at 26 (classifying newspapers' pre-publication information as property because it constitutes "[c]onfidential business information," which "has long been recognized as property"). Neither test scores nor score reports satisfy this condition.

The "fallout" from the government's approach "underscores [its] implausibility." *Van Buren v. United States*, 141 S.Ct. 1648, 1661 (2021). If the government is correct that something is property simply because it may be said to have "economic value" or is associated with "rights of allocation, exclusion, and control," Opp.18, there is virtually no limit to

what the fraud statutes might reach. Consider time. Time has economic value and is subject to rights of control, allocation, and exclusion. So is it wire fraud for someone to lie to get a neighbor's help with a chore? For a journalist to lie in an email to a potential source to secure an interview? For a politician to lie to secure a meeting with a potential donor? The government would surely say it would never prosecute such conduct, but that is no answer. Courts "cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *Marinello v. United States*, 138 S.Ct. 1101, 1109 (2018).

Furthermore, the government's approach would render *Skilling* a dead letter. To avoid vagueness concerns, *Skilling* held that honest-services fraud does not encompass "action by [an] employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." 561 U.S. at 409. Under the approach it advocates here, however, the government could simply recharacterize such actions as property fraud—with all the vagueness that would entail. After all, jobs have economic value and carry rights of control, allocation, and exclusion; by concealing breaches of fiduciary duty to avoid being fired, an employee would deprive his employer of both

the rights and economic value associated with his position.[2] *See United States v. Yates*, 16 F.4th 256, 267 (9th Cir. 2021) (noting that the government declined to say whether "an employee who wastes time on the Internet but then, to avoid being fired, falsely claims to have been working productively" would be "guilty of federal fraud"). The government therefore cannot be right. As this Court has recognized, it cannot "let in through the back door the very prosecution theory that the Supreme Court tossed out the front." *Ochs*, 842 F.2d at 527.

Finally, even if the government's interpretation of "property" were correct, it still would not encompass the object of the fraud here. The government's "shifting and imprecise characterization of the alleged property at issue," *Sekhar*, 570 U.S. at 737, aims to obscure what this case is really about: a "fraudulently inflated exam score," JA134; *see supra* at 5-6. The problem for the government is that ACT has no property interest

---

[2] Indeed, in *McNally*, Justice Stevens advanced precisely this view, arguing that honest-services deprivations were cognizable as property fraud because "[w]hen a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for." 483 U.S. at 377 n.10 (Stevens, J., dissenting). Had a majority of the Court agreed, "his would have been a majority opinion and not a dissent." *Ochs*, 842 F.2d at 526.

in specific scores. The government suggests that in fraudulently obtaining a higher score, Appellant deprived ACT of two interests: economic value and the right to exclude. Opp.21. But ACT "does not 'sell' [specific scores] in the ordinary commercial sense," *Cleveland*, 531 U.S. at 23, and thus has no economic interest in whether a student gets one score or another. Any economic value in a score is limited to the registration fee, which Appellant paid. The government must therefore rely on the idea that ACT would have "refuse[d] to convey" the specific score to Appellant's son had it known of the cheating. Opp.15. But this is simply another way of saying that ACT was entitled to accurate information before releasing the score, and as multiple courts of appeals have recognized, such an "ethereal right to accurate information" is not "an interest that 'has long been recognized as property.'" *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014); *accord Yates*, 16 F.4th at 265 ("Recognizing accurate information as property would transform all deception into fraud.").

## C.    The Government Misunderstands *Hedaithy*.

Perhaps the clearest sign the government wants to avoid deciding this case based on the actual interests at issue here is its heavy reliance

on *United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004). Opp.10-17. As the government concedes (Opp.13), *Hedaithy* held that physical score reports were property because they were "tangible items, held in the physical possession of a private entity." 392 F.3d at 597. The court expressed "no doubt that tangible pieces of paper held in the possession of a private entity are 'property,'" even if "they have negligible value," but went on to explain that physical score reports in fact have value because they embody the "substantial and valuable services that ETS provides." *Id.* at 598, 600.

Thus, although the government scorns the idea that "score reports' status as property depends on their conveyance in physical form," Opp.16, the reports' physical nature was in fact the linchpin of *Hedaithy*'s reasoning. *Hedaithy* did not hold, as the government urges here, that the information the reports embodied was itself property; it simply observed that the information contributed to the reports' value. But all kinds of intangible interests—*e.g.*, time, creativity, craftsmanship, precision—may make a given piece of property more valuable without themselves being property. To hold otherwise would give the federal fraud statutes an untenably broad and nebulous scope.

Furthermore, there are good reasons not to follow *Hedaithy*. First, after *Kelly*, *Hedaithy*'s property analysis arguably is no longer valid because it focuses on an incidental record, not the actual object of the fraud—test scores. And second, insofar as *Hedaithy* can be read to endorse the idea that scores are property because they have value, it is wrong for the reasons described above: Under *Cleveland* and *Carpenter*, the question is not whether an interest has economic value, but whether it has long been considered property. *Supra* at 9-10. Neither test scores nor any ethereal right to accurate information in issuing test scores qualifies.

Finally, to deflect from its inability to offer any limiting principle for its theory of property, the government conjures its own parade of horribles. It argues that to read *Hedaithy* as turning on the score reports' physical nature would call into question whether all kinds of digital assets are property. Opp.16. But this argument is a non-sequitur. The fact that *some* intangible interests are not property does not mean *no* intangible interests are.[3] The question is simply whether the intangible

---

[3] Indeed, the entire basis of copyright protection turns on reducing an idea to a "tangible medium of expression." 17 U.S.C. §102(a); *see Uneeda Doll Co. v. P & M Doll Co.*, 353 F.2d 788, 789 (2d Cir. 1965) (per curiam)

interest itself has long been recognized as property. *Supra* at 10. Stocks, computer programs, airline tickets, and Bitcoin—the examples the government gives—are property even in digital form because they are, respectively, ownership interests, intellectual property, entitlement to collect money, and money—all of which have long been recognized as property. Because the government makes no comparable showing for test scores or score reports, those interests are not property.

## II.    ACT TESTS WERE AN IMPLEMENTATION COST, NOT AN OBJECT, OF THE ALLEGED SCHEME.

The government likewise fails to show that its alternative theory, that Appellant committed wire fraud by obtaining the ACT test itself, is valid. The only object of Appellant's scheme—his sole purpose in paying Rick Singer $50,000—was to obtain a higher ACT score for his son. Br.43-44. Obtaining the test itself was merely an "implementation cost[]" of this scheme, and therefore, under *Kelly*, not a basis for a wire fraud charge. 140 S.Ct. at 1573-74.

---

("It is well settled that there can be no copyright on an 'idea' itself but only on the tangible 'expression' of the idea."). This is true even though an idea itself may have economic value and be associated with rights of control, allocation, and exclusion.

In response, the government argues that the test must have been an object of the fraud because "[t]he entire scheme depended on it"—*i.e.*, it was "necessary, central, and critical." Opp.26, 28. *Kelly*, however, forecloses this argument. It specifically held that the time and labor of Port Authority employees were "just the implementation costs of the defendants' scheme" to create traffic gridlock, even though they were "foreseen" and "'needed' to realize the final plan." 140 S.Ct. at 1573-74. *Kelly* thus makes plain that the fact that property is "necessary, central, and critical," Opp.28—in a word, "needed"—does not determine whether it is a scheme's object.

Indeed, *Kelly* would have come out differently were the government correct. The Court's opinion described the fake traffic study and extra toll collector as necessary "[t]o complete the scheme" and "to make the scheme work." 140 S.Ct. at 1569-70. That was the only reason the defendants arranged and approved that work—after all, they were otherwise uninterested in it. *See id.* at 1574; Opp.25. Therefore, if the government were right, *Kelly* should have held that because the "entire scheme depended on" the fake traffic study and extra toll collector, Opp.26, the

associated labor costs were an object of the fraud. *Kelly*'s contrary outcome confirms that the government is wrong.

The same analysis applies to *Cleveland*. As *Kelly* observed, the government could have argued in *Cleveland* that "some state worker had to process each of the fraudster's falsified applications" for a gambling license, and that those labor costs were an object of the fraud. 140 S.Ct. at 1573. By the government's logic here, that surely would have been correct. The application could not process itself; an employee's time and corresponding labor costs were "necessary, central, and critical," Opp.28, to the success of the scheme. But, as *Kelly* explained, that made no difference: The employee's time was not an object of the scheme. 140 S.Ct. at 1573.

Instead of the government's line, *Kelly* adopted a commonsense approach to distinguishing objects from implementation costs by looking at the "entire point" of a scheme. *Id.* Put another way, *Kelly* looked to what the defendants aimed to obtain through fraud. The Court recognized that labor costs could be an object if the "entire point of the fraudsters' plans was to obtain the employees' services," as when a "mayor uses deception to get 'on-the-clock city workers' to renovate his daughter's new home."

*Id.* But since the point of the misrepresentations in *Kelly* was to rearrange traffic, and the traffic study and extra toll collector in no way satisfied that goal themselves, the associated labor costs were merely an implementation cost, even though they too were obtained dishonestly.

Here, both the Indictment and common sense make clear that "entire point" of Appellant's scheme was to obtain a higher test score. It is ridiculous for the government to suggest that Appellant "fl[ew] himself and his son across California and spen[t] $50,000," Opp.26, to obtain a test that was available at his son's school for the price of a registration fee, *see* JA28¶184. As the Indictment alleges, it is the score—not the test—that is "material" to college admission, JA6¶45, and the score—not the test—that Appellant's son included in his application, JA31¶200; *see also* JA12¶66(i) (noting that Singer advertised his "fraudulent schemes" as "tried-and-true methods of improving exam scores"). Like the *Kelly* defendants, Appellant was indifferent to the content of the test itself except insofar as it was "'needed' to realize the final plan." *Kelly*, 140 S.Ct. at 1574.

*United States v. Shelton*, 997 F.3d 749 (7th Cir. 2021), which the government cites (Opp.27), tracks this approach. *Shelton* affirmed a

conviction where the defendant and others used government staff "to run their [political] campaigns on government time while using government resources." 997 F.3d at 775. *Shelton* described this as the "paradigmatic case[]" of property fraud set forth in *Kelly* itself—one in which "[t]he entire point of the fraudsters' plans was to obtain the employees' services." *Id.* at 774-75 (quoting *Kelly*, 140 S.Ct. at 1573).

The same is true of *United States v. Gatto*, 986 F.3d 105 (2d Cir.), *cert. denied*, 142 S.Ct. 710 (2021), which affirmed wire fraud convictions of Adidas employees who schemed to get scholarships for top athletes at Adidas-sponsored universities by bribing them to attend those universities and then having them falsely certify to the universities that they had not been paid to play. *See id.* at 111-12. There, the entire point of the defendants' misrepresentations was to conceal the bribes from the universities, so that the players could receive financial aid and compete. *See id.* at 116. In other words, the scholarships were the very thing the defendants sought to obtain through fraud, not an implementation cost incurred along the way. To be sure, in reaching this conclusion, *Gatto* adopted the understanding of *Kelly* the government advances here. *See*

*id.* But, as shown above, that understanding is incorrect, and it is *Kelly*, not *Gatto*, that must guide the analysis.[4]

Ultimately, what the government fails to grapple with is that money and property are necessary implementation costs to all sorts of everyday lies nobody would reasonably think are federal crimes. Appellant's brief gave two examples, academic cheating and online dating, to which the government offers no meaningful response. The government does not dispute that if cheating has two objects (the score and the exam needed to obtain the score), then much academic dishonesty is a federal crime. And its only response to the online-dating example is to observe that some romantic scams have money or property as their object. Opp.28-29. True enough, but the government's theory reaches far beyond such scams, to commonplace situations where the "victim's" money or property (*e.g.*, in paying for the date) is a foreseen, necessary, and central means of attaining some romantic or social end. By misreading *Kelly*, the government wants to erase the line keeping these (and many other) situations from prosecutors' grasp. This Court should reject that effort.

---

[4] The government's reliance (Opp.27-28) on similar reasoning in the *Yates* dissent is unavailing for the same reasons.

## III. THE INDICTMENT DOES NOT ALLEGE THE FIDUCIARY ELEMENT OF HONEST-SERVICES FRAUD.

### A. Under *Skilling*, §1346 Does Not Reach Informal Fiduciaries.

Finally, the Indictment should be dismissed because it does not allege a fiduciary relationship giving rise to "the intangible right of honest services." 18 U.S.C. §1346. As Appellant showed, *Skilling* limited §1346 to the "core pre-*McNally* applications" of the honest-services doctrine, and informal fiduciary relationships of the sort alleged here fall outside that core. 561 U.S. at 408; Br.46-56.

Resisting this conclusion, the government manages to read *Skilling* both too broadly and too narrowly. First, it argues that *Skilling* "foreclosed" Appellant's argument by construing §1346 to cover bribe and kickback cases. Opp.39-40. But it is undisputed that *Skilling* had no occasion to address whether informal fiduciaries were within the statute's reach because, as Enron's CEO, Skilling was plainly a formal fiduciary. The government nevertheless suggests that *Skilling* resolved all of the questions raised in Justice Scalia's concurrence, including "the character of the 'fiduciary capacity' to which the bribery and kickback restriction applies." Opp.42. But the government tellingly cannot identify any language in the majority opinion purporting to resolve that issue, and

Justice Scalia expressly faulted the majority for "not solv[ing] th[is] most fundamental indeterminacy." *Skilling*, 561 U.S. at 421 (Scalia, J., concurring in part and in the judgment).

Second, while overreading *Skilling* to resolve questions not presented *there*, the government ignores that *Skilling*'s reasoning supplies the framework for answering the question presented *here*. *Skilling* construed §1346 to encompass only "the core pre-*McNally* applications" of the honest services doctrine, and delimited that core by reference to the features common to the "'vast majority' of [pre-*McNally*] honest-services cases." *Id.* at 407-08 (majority opinion). The government does not dispute that the vast majority of such cases involved formal fiduciary relationships. To be sure, it references two pre-*McNally* cases applying the honest services doctrine to informal fiduciaries, Opp.40 n.8, but it buries this point in a footnote for good reason: There also were pre-*McNally* cases applying the honest services doctrine to conflict-of-interest cases, and *Skilling* nevertheless held that "amorphous category" fell outside the pre-*McNally* core "[i]n light of the relative infrequency" of such cases. 561 U.S. at 410. The same goes here: the relative infrequency of cases

involving informal fiduciaries places that amorphous category outside the pre-*McNally* core, and thus outside §1346 as well.

The government counters that several cases have construed §1346 to encompass informal fiduciaries, Opp.45, but it does not dispute that those cases failed to engage with *Skilling*'s reasoning or cite caselaw placing informal fiduciaries in the pre-*McNally* core. Br.55 (discussing *United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012) (en banc) and *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc)). Rather, the government argues that those failures are no basis to "doubt the reasoning of those cases" because the cases' holdings did not violate fair-warning principles. Opp.45 n.9. This response misses the point.[5] Those cases' reasoning and results were wrong not because they represented too great a conceptual leap, but because *Skilling* provided a rule of construction for §1346 that those cases ignored, resulting in incorrect decisions this Court should not follow.

---

[5] The government's assertion that Appellant "derive[s] his 'formal' fiduciary duties limitation from *Skilling*'s listed examples," Opp.46, likewise misconstrues Appellant's argument. As shown above, the limitation derives from the rule of construction *Skilling* adopted. The examples *Skilling* lists merely reinforce the limitation. 561 U.S. at 407 n.41.

That said, expanding §1346 to informal fiduciaries *would* create grave fair notice problems, Br.50-56, for which the government's brief offers no solutions. The government argues that "the existence of a fiduciary duty on these facts" was clear, Opp.44, but even if that were correct, it says nothing about the indeterminacy in defining informal fiduciary relationships in general. *See UBS Fin. Servs., Inc. v. Aliberti*, 483 Mass. 396, 408, 133 N.E.3d 277, 290 (2019) ("The circumstances which may create a fiduciary relationship are so varied and so difficult to foresee that it is unwise for courts to attempt to make comprehensive definitions."). All sorts of advisors and salespeople who are not formal fiduciaries receive commissions, rebates, and other forms of compensation that, if their relationship with a customer were deemed one of trust and confidence, could be characterized as kickbacks. By extending §1346 to informal fiduciaries, the government seeks to sweep in a nebulous category of relationships in which the fiduciary character arises from a totality of circumstances, the import of which may be ascertainable only post-hoc. It is *that* indeterminacy which creates fair notice problems because "[i]t is simply not fair to prosecute someone for a crime that has not been defined

until the judicial decision that sends him to jail."[6] *Sorich v. United States*, 555 U.S. 1204, 1207 (2009) (Scalia, J., dissenting from denial of certiorari). The Supreme Court has sought to combat similar indeterminacy under the fraud statutes by limiting them to traditionally recognized property interests, and this Court should not allow the government to reintroduce the problem through §1346.

The government responds that informal fiduciary relationships are cognizable in securities fraud, Opp.47-48, but this argument ignores important differences between that context and honest-services fraud. First, in the securities context, the SEC has promulgated a regulation enumerating in detail instances in which a "duty of trust or confidence"—*i.e.*, an informal fiduciary relationship—exists. 17 C.F.R. §240.10b5-2(b). No comparable provision exists to provide notice of the sorts of "specific relationship[s]" falling under §1346. *Chiarella v. United States*, 445 U.S. 222, 233 (1980).

---

[6] The government's suggestion that courts can avoid this problem by labeling informal fiduciaries as "agent[s]," Opp.51, does nothing to resolve this indeterminacy where, as here, both the "agent" and "fiduciary" labels turn on the same post-hoc totality-of-the-circumstances analysis.

Second, and relatedly, securities fraud is a limited, well-defined context that usually involves sophisticated parties. Thus, there is rarely uncertainty about whether securities law applies to given conduct. But, as Appellant's brief showed (Br.53-54), that is not true of §1346. If construed as the government wishes, the statute would cover myriad ostensibly arm's-length business relationships. The government's only response is that §1346's *mens rea* of specific intent "blunts any potential vagueness concerns." Opp.48. In *Skilling*, however, the Supreme Court rejected a nearly identical argument. There, the government relied on a specific intent requirement to attempt to define undisclosed self-dealing with "sufficient definiteness and specificity to overcome due process concerns," but the Court deemed the effort inadequate, observing that the government's proposal still "leaves many questions unanswered." 561 U.S. at 411 n.44. Likewise here, the government's argument leaves unanswered many questions about when an informal fiduciary relationship—and thus criminal liability under §1346—may arise. The government thus asks this Court to construe §1346 in a manner that would not "give fair warning of the conduct that it makes a crime." *Bouie v. City of Columbia*, 378 U.S. 347, 350-51 (1964). This Court should decline.

**B.  Appellant Preserved His Honest-Services Arguments for Appeal.**

The government's attempt to duck Appellant's honest-services challenge by asserting waiver and forfeiture is equally meritless. Setting aside the irony of the government's demand for hyper-literal adherence to the terms of a plea agreement that nowhere mentions score reports as property, JA111-18, the plea agreement in fact preserves Appellant's honest-services challenge, which was both raised by Appellant and passed on by the court below.

As the government acknowledges, "[p]lea agreements are construed under basic contract principles." *United States v. Acosta-Roman*, 549 F.3d 1, 3 (1st Cir. 2008). Thus, "a court seeks to put itself in the position [the contracting parties] occupied at the time the contract was made." Restatement (Second) of Contracts §202 cmt. b (1981). Courts also consider the parties' course of dealing to help "determine the meaning of language." *Id.* §223 cmt. b. And, with respect to plea agreements specifically, courts resolve any ambiguities "in favor of allowing the appeal to proceed." *United States v. Fernández-Cabrera*, 625 F.3d 48, 51 (1st Cir. 2010).

Interpreted according to these principles, the plea agreement preserved Appellant's honest-services challenge. In relevant part, it provided that Appellant could appeal "the denial of his Motion to Dismiss Count Seven of the Fourth Superseding Indictment, Dkt. 1023, only to the extent that the motion argued … that the Indictment did not adequately allege facts establishing that test administrators owed a fiduciary duty to testing companies in this case." JA111-12. The referenced two-page motion seeks dismissal of Count Seven insofar as it alleged a scheme to defraud ACT of property and honest services, insofar as it alleged a scheme to deprive universities of property and honest services, and on various procedural grounds. JA73-74. The plea agreement plainly intended to permit appeal of the first set of issues, which the motion summarized as a "fail[ure] to allege any deprivation of either a property interest or a breach of a fiduciary duty, which are required elements under the applicable statutes." JA73. Appellant's challenge to the adequacy of the allegations thus focused on the failure to allege "required elements" of the applicable statutes—precisely what Appellant argues here. But the motion did not otherwise develop Appellant's arguments; rather, it incorporated by reference separate briefing regarding a different count. *Id.*

29

That briefing, in turn, raised the issue pressed here, arguing that an "independent contractor" relationship was insufficient under §1346 because a fiduciary relationship "requires more, such as an 'employee-employer' relationship." D.Ct.Dkt.1022 at 14 (citing *Skilling*, 561 U.S. at 408 n.41, the same footnote discussed above). The government understood the argument just as it is outlined here, and responded that "[t]he law is clear that § 1346 applies equally to … 'a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers,'" citing some of the very cases—*Milovanovic* and *Rybicki*—it invokes here.[7] D.Ct.Dkt.1170 at 40. Appellant's reply argued that, "[t]ypically, the 'existence of a fiduciary relationship' is 'beyond dispute,'" and that, "[w]hile some circuits have adopted an expansive definition of fiduciary relationships, the Government has not cited to one First Circuit case that does so." D.Ct.Dkt.1232 at 10. It also challenged *Milovanovic*'s "expansive definition of fiduciaries," *id.* at 11—the very definition

---

[7] Although its brief below asserted that Appellant had not "meaningfully dispute[d]" this issue, the government nevertheless responded to it. D.Ct.Dkt.1170 at 40.

Appellant challenges here. *See Milovanovic*, 678 F.3d at 724 (holding that §1346 "is not limited to a formal 'fiduciary' relationship").

The district court also recognized Appellant's argument here was in play by explicitly rejecting it. After noting that "the existence of a fiduciary duty between employer and employee is 'beyond dispute,'" the court stated: "Relevant here, a fiduciary duty may also arise under certain circumstances in the context of an independent contractor relationship." JA100. For this proposition, the court cited *Milovanovic* and *Rybicki*—again, the same cases the government invoked both here and below. Opp.45 & n.9, 47.

Thus, read in light of the record, the plea agreement preserved Appellant's challenge here. Indeed, the government's position would have the anomalous result of making this particular point the *only* relevant argument from the briefing *not* preserved. Furthermore, the government seems to recognize that the relevant language of the plea agreement is not limited to "challenges to the Indictment's factual adequacy," Opp.31, but also includes challenges to its legal sufficiency. The agreement uses identical language regarding the adequacy of the allegations of a scheme to obtain the ACT itself, JA112, yet the government does not suggest that

language precludes Appellant's *Kelly* argument. Likewise, the agreement does not preclude Appellant from arguing the Indictment fails to allege the "required" fiduciary "element[]" of honest-services fraud. JA73.

Finally, the government argues that Appellant should not even be able to defend against this spurious waiver claim because his opening brief did not preemptively challenge it. Opp.34-35. That is not the law. First, the rule the government invokes applies to appeal waivers, not to provisions expressly reserving appellate rights. Second, even if that rule applied here, the obligation to preemptively challenge an appeal waiver arises only when there is a "colorable question" about its applicability. *United States v. Colón-Rosario*, 921 F.3d 306, 310 (1st Cir. 2019). The First Circuit has found this standard met in cases where defendants agreed to categorical waiver provisions. *See United States v. Fuentes-Moreno*, 954 F.3d 383, 390-91 (1st Cir. 2020); Plea and Forfeiture Agreement 6, *United States v. Fuentes-Moreno*, No. 3:17-cr-00167-FAB (D.P.R. June 11, 2018), ECF No. 114 (waiving "right to appeal any aspect of this case's judgment and sentence"). But the government has identified no case applying this rule in circumstances like those here, and Appellant is aware of none. Indeed, in *United States v. Adams*, 971 F.3d 22 (1st Cir.

2020), this Court considered the scope of issues preserved in a conditional plea despite the fact that the defendant did not preemptively address the issue in his brief. *Compare id.* at 30-31, *with* Appellant Br., *Adams*, 971 F.3d 22 (No. 18-1465). The government's argument thus "wrests [this rule] from it[s] contextual moorings." *Colón-Rosario*, 921 F.3d at 310. A defendant need not anticipate and preempt government attempts to claw back appellate rights it previously agreed to.

## CONCLUSION

For the foregoing reasons, and those stated in Appellant's brief, the judgment below should be vacated and the Indictment dismissed.

Dated: February 2, 2022                   Respectfully submitted,


                                          */s/ Carter G. Phillips*
                                          Carter G. Phillips

Jack W. Pirozzolo (#61887)        Carter G. Phillips (#48909)
SIDLEY AUSTIN LLP                 Daniel J. Feith (#1199069)
60 State Street, 36th Floor       John L. Gibbons (#1199068)
Boston, MA 02109                  SIDLEY AUSTIN LLP
Tel.: (617) 223-0304              1501 K Street NW
Fax: (617) 223-0301               Washington, D.C. 20005
jpirozzolo@sidley.com             Tel.: (202) 736-8000
                                  Fax: (202) 736-8711
John C. Hueston (#1199021)        cphillips@sidley.com
HUESTON HENNIGAN LLP              dfeith@sidley.com
523 W. 6th Street                 jgibbons@sidley.com
Los Angeles, CA 90014

Tel.: (213) 788-4340
jhueston@hueston.com

*Counsel for Appellant William McGlashan, Jr.*

## CERTIFICATE OF COMPLIANCE

1.    This reply brief complies with the type-volume limitation of Fed. R. App P. 32(a)(7)(B) because this brief contains 6,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This reply brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point size and Century Schoolbook style.

*/s/ Carter G. Phillips*
Carter G. Phillips

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2022, I caused the foregoing to be electronically filed with the U.S. Court of Appeals for the First Circuit via the CM/ECF system, which will automatically send email notifications of such filing to all attorneys of record.

*/s/ Carter G. Phillips*
Carter G. Phillips